PEOPLE v BILLUPS

PEOPLE v BARNES

Docket No. 43122. Submitted February 5, 1980, at Lansing.—Decided September 15, 1980.

George Billups and Robert D. Barnes were convicted of three counts of felony murder and four counts of armed robbery, and sentence was imposed, Recorder's Court of Detroit, Geraldine B. Ford, J. Defendants appeal, alleging that the trial court erred in instructing the jury on the element of malice in first-degree felony murder, in failing to produce a res gestae witness, in instructing the jury on the elements of aiding and abetting and of intent in the offense of armed robbery, in defining circumstantial evidence to the jury, in failing, *sua sponte,* to give special instructions regarding identification of the defendants and in failing to caution the jury concerning their consideration of accomplice testimony, in allowing the preliminary examination testimony of a witness to be read during the trial, in allowing the prosecutor's impeachment of a prosecution witness, and in its denial of defendants' motions for separate trials. Defendant Billups also alleges that the assistance of his trial counsel was ineffective. *Held:*

1. The trial court did not err in instructing the jury regarding felony murder, since the element of malice required for conviction of felony murder may be directly imputed as a matter of law from the underlying felony.

2. Defendants' allegation that the prosecution failed to produce a res gestae witness is groundless since the witness testified during trial.

3. The instructions on aiding and abetting were sufficient.

REFERENCES FOR POINTS IN HEADNOTES

[1, 8] 40 Am Jur 2d, Homicide §§ 72, 269.
[2] 75 Am Jur 2d, Trial § 724.
[3] 5 Am Jur 2d, Appeal and Error §§ 810, 815.
[4] 75 Am Jur 2d, Trial §§ 690, 818-820.
[5] 29 Am Jur 2d, Evidence § 754.
    75 Am Jur 2d, Trial §§ 162, 164, 166.
[6] 81 Am Jur 2d, Witnesses §§ 619-625.
[7] 75 Am Jur 2d, Trial §§ 17-24.

4. The instruction regarding armed robbery included instruction on the required element of intent.

5. The instruction defining circumstantial evidence, while not precise, is not grounds for reversal since defendants' convictions were based on eyewitness testimony rather than circumstantial evidence.

6. There was no need for the trial court, *sua sponte*, to give a special instruction concerning identification of the defendants in light of eyewitness identifications and adequate jury instructions regarding reasonable doubt.

7. There was no necessity for the trial court to caution the jury, *sua sponte*, concerning their consideration of accomplice testimony since the accomplice offered no testimony prejudicial to defendants.

8. The trial court committed no error in allowing the preliminary examination testimony of a witness to be read during trial since counsel stipulated that the witness was unavailable, the witness was subjected to cross-examination at the preliminary examination, no objection was made upon admission of the testimony, and the testimony was not crucial.

9. The trial court did not err in allowing the impeachment by the prosecutor of his own witness since her testimony was contrary to that anticipated and was injurious to the prosecutor's case.

10. The determination to hold a joint trial was discretionary with the trial court, and no affirmative showing of prejudice to the defendants' substantial rights having been made, it will not be overturned.

11. Defendant Billups offered no substantiation of his allegations of ineffective assistance by his counsel. The records shows he was furnished a fair trial with able representation.

Affirmed.

M. F. CAVANAGH, J., dissented. He would hold that the trial court erred in instructing the jury regarding the element of malice, removing from them the necessity to find any malice. He would remand for entry of manslaughter verdicts and resentencing or for retrial for first-degree murder.

OPINION OF THE COURT

1. HOMICIDE — FELONY MURDER — IMPUTATION OF MALICE

The element of malice required for conviction of felony-murder may be directly imputed as a matter of law from the underlying felony.

2. CRIMINAL LAW — AIDING AND ABETTING — JURY INSTRUCTIONS.

Instructions to a jury in a criminal case on aiding and abetting are sufficient where they charge a jury with finding that a principal is guilty of the charged offense, the defendant supported or encouraged the principal in the commission of the charged offense, and the defendant, himself, entertained the requisite intent of the charged offense sufficient for a return of a verdict of guilty.

3. CRIMINAL LAW — CIRCUMSTANTIAL EVIDENCE — JURY INSTRUCTIONS — GROUNDS FOR REVERSAL.

A jury instruction imprecisely defining circumstantial evidence is not grounds for reversal where a defendant's conviction stems from eyewitness testimony rather than circumstantial evidence.

4. CRIMINAL LAW — ACCOMPLICE TESTIMONY — JURY INSTRUCTIONS.

A trial court need not caution a jury, *sua sponte,* concerning their consideration of accomplice testimony where the accomplice offers no testimony at trial that is prejudicial to the defendant.

5. TRIAL — PRELIMINARY EXAMINATION TESTIMONY — ERROR.

A trial court's allowing preliminary examination testimony of a witness to be read into the record at trial does not constitute error where counsel stipulated that the witness was hospitalized at the time of trial and was physically unable to speak, the witness was subjected to cross-examination at the preliminary examination, no objection was made upon admission of the testimony and other testimony was equally damaging to the defendant.

6. EVIDENCE — IMPEACHMENT.

The credibility of a witness may be attacked by the calling party where his testimony is contrary to that anticipated and is injurious to the calling party's case (MRE 607[2][C]).

7. CRIMINAL LAW — JOINT TRIALS — JUDICIAL DISCRETION — STANDARD OF REVIEW — STATUTES.

The determination to hold a joint trial in a criminal case is discretionary with the trial court and will not be overturned absent an affirmative showing that the joint trial prejudiced the substantial rights of the accused (MCL 768.5; MSA 28.1028).

DISSENT BY M. F. CAVANAGH, J.

8. CRIMINAL LAW — JURY INSTRUCTIONS — FELONY MURDER — ELE-
MENT OF MALICE — ERROR.

An instruction to a jury, in a trial in which a defendant is
charged with felony murder, which removes from the jury the
necessity to find any malice constitutes error and should be
grounds for a remand for entry of a verdict of manslaughter
and resentencing or for retrial for first-degree murder, should
the prosecutor so elect.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *William L. Cahalan,*
Prosecuting Attorney, *Edward Reilly Wilson,* Prin-
cipal Attorney, Appeals, and *Nels L. Olson,* Assist-
ant Prosecuting Attorney, for the people.

*Robert E. Slameka,* for defendant on appeal.

Before: CYNAR, P.J., and V. J. BRENNAN and
M. F. CAVANAGH, JJ.

CYNAR, P.J. Defendants George Billups and Rob-
ert Barnes were charged with, and convicted by a
jury of, three counts of felony murder, MCL
750.136; MSA 28.548, and four counts of armed
robbery, MCL 750.529; MSA 28.797. They were
both sentenced to life imprisonment for the mur-
der convictions and 40 to 60 years for the armed
robberies. An accomplice, Charlene Billups, was
similarly charged, but bargained for pleas of guilty
to two counts of second-degree murder and two
counts of armed robbery. She was sentenced to life
imprisonment also and was endorsed as a prosecu-
tion witness. Defendants George Billups and Rob-
ert Barnes appeal as of right.

We are in agreement with our brother CAV-
ANAGH on all of the issues submitted for our
consideration with one exception. We conclude
that the trial court correctly instructed the jury
regarding the element of malice in first-degree

felony murder and decline to reverse on the basis
of *People v Fountain,* 71 Mich App 491; 248 NW2d
589 (1976). In support of our position, we maintain
that the strongest argument in opposing the appli-
cation of *Fountain* herein is contained in the
proofs in the matter before us.

Mary Mathis stated that she was familiar with
the building located at 2912 Belvidere, Detroit. On
January 30, 1977, Ms. Mathis was at the building.
John "Smitty" Smith ran a social club at this
address where people would come to play cards
and drink. At 7 p.m., she, John "Smitty" Smith,
Alan Campbell, Virginia Stewart, Gloria Goolsby,
Chuck Mills, Sidney Mills, a Mr. Tubbs, and one
other person were at the building. Around 7 p.m.,
while Ms. Mathis was in the kitchen, she heard a
knock on the door. When she turned around, she
saw Charlene Billups and "that light-skinned guy"
(Robert Barnes). A few seconds later, another
"dark-skinned guy" also entered the building. Ms.
Mathis had seen him in the past and identified
defendant George Billups as the man in question.
Defendant George Billups was carrying a machine
gun. When Ms. Mathis saw this, she ran upstairs
and hid in a bedroom. Defendant Barnes came
upstairs and ordered her to go downstairs with the
others. Ms. Billups was taking the money of those
downstairs. At this point, defendant George Bill-
ups held the machine gun, and Barnes held two
handguns. These guns were pointed at the people
in the building. Ms. Billups also had a gun. After
the money was collected, defendants George Bill-
ups and Barnes indicated that they were "fixing to
kill everybody in here". However, they were not
going to "mess" with Ms. Mathis because she was
pregnant. Barnes then shot Alan Campbell in the
head. Following this killing, he put the gun to

John Smith's head and pulled the trigger. Ms. Mathis then ran off and climbed out an upstairs bedroom window. On the way upstairs, she heard Ms. Billups say, "Kill them all". A lot of shooting was then heard. After the shooting, one of the men said, "Let's get out of here". Ms. Billups replied, "You left two of them". However, one of the men said to forget them. Ms. Mathis then saw all three run out front.

At a lineup the next day, Ms. Mathis positively identified defendant George Billups. She also identified Barnes, but at the lineup his hair was a little different and she indicated that "it looks like him". On cross-examination, the witness stated that the lineup included two or three light-skinned black men. However, none of the others looked like defendant Barnes.

Gloria Goolsby testified that John Smith lived at 2912 Belvidere in January 1977, and that he was her boyfriend. On January 30, 1977, she was at the Belvidere address. Around 6 p.m., Ms. Goolsby went upstairs to the bathroom to get ready to go home. She heard a lot of commotion downstairs and also saw Ms. Mathis run by. Ms. Goolsby could tell something was wrong, so she hid in a bedroom. However, Barnes found her and ordered her downstairs at gunpoint. She then saw Charlene Billups collect money from Mr. Tubbs. At this time, she also saw defendant George Billups with a machine gun. Barnes then shot Alan Campbell and John Smith in their heads. Ginny Stewart then jumped up, and a table was overturned. The two Billupses and Barnes then left the house. Several dead bodies remained in the room.

At a lineup held the next day, Ms. Goolsby was not able to identify defendant George Billups. She also indicated that the only physical difference

between the other man involved in the killings and Barnes was the hairstyle.

Adrienne Adams stated that on January 30, 1977, she went to the Belvidere address to visit Ms. Mathis and Ms. Goolsby. About 7:15 p.m., she left the Belvidere house to go to the store. Near the entrance of the house, she heard gunshots. She then saw two men and a woman run out of the house. In court, she identified Barnes as one of the men she saw. She also identified Charlene Billups, but could not identify the other man involved. However this man carried a machine gun.

On cross-examination, Ms. Adams stated that, when returning from the store, she saw a 1974 gold LeSabre parked in front of 2912 Belvidere. She recognized this car as belonging to Barnes.

Lofton Stepney stated that on January 30, 1977, he was at 2912 Belvidere, otherwise known as Smitty's place. While there, a man aimed two pistols at him and took his money. A woman told Barnes to go upstairs and get two women. Mr. Stepney stated that the "man in the yellow shirt" (Billups) shot John Smith with a rifle. At a lineup following the incident and a preliminary examination, the witness had been unable to identify any of the participants in the incident. Mr. Stepney was shot in his left buttock.

On cross-examination, Mr. Stepney indicated that his memory of the incident was better now and that he had "been dreaming about it". According to the witness, only defendant George Billups shot anybody.

Charles Mills, Jr., stated that he was at 2912 Belvidere on January 30, 1977. About 7 p.m., there was a knock on the door. John Smith opened it, and a woman screamed "this is a holdup". A man walked in and took a pistol the witness was carry-

ing from him. Some three or four minutes later, a lot of shooting erupted. When he looked up, John Smith, Alan Campbell, and his brother, Sidney Mills, were all dead. Mr. Mills was unable to identify any of the assailants.

Carrie Gilliam testified that she lived at 2916 Belvidere, "in front of Smitty's place". On January 30, 1977, she heard two shots. She looked out her window and saw a girl run across the street between two houses. She also saw people on Smitty's porch "hollering and screaming". She then observed a dark maroon car drive off quickly.

The preliminary examination testimony of Eli Tubbs was read into the record. Mr. Tubbs had been hospitalized with cancer since June 30, 1977, had undergone two operations, and could no longer speak. Mr. Tubbs had previously stated that he was at 2912 Belvidere on January 30, 1977. On this night, a shooting occurred. The witness identified defendant George Billups as having participated in robbing him of $2. The witness also identified Charlene Billups. On cross-examination, the witness had indicated that he had drunk enough to be intoxicated.

Charlene Billups stated that she was originally charged along with the two defendants in the case. However, she pled guilty to two counts of second-degree murder and to two counts of armed robbery and was now serving a life sentence. Ms. Billups stated that her brother, defendant George Billups, had not asked her to participate in the holdup with him.

Due to this testimony, the jury was excused, and the prosecutor was allowed to lay a foundation for impeachment. Thereafter, a tape was played in which Ms. Billups admitted participating in the episode. She also stated that defendant Billups had

asked her to holdup "Smitty's". During the course
of the holdup, George Billups shot John Smith and
another person in the head. She also indicated
that Barnes participated in the holdup and shoot-
ings with a machine gun. After hearing the tape,
Ms. Billups denied its accuracy and said the state-
ment was given under pressure.

When court was reconvened, Ms. Billups stated
that a holdup occurred about 7 p.m. at Smitty's
house on January 30, 1977. However, the witness
could not give details because she was "half high
at the time". Ms. Billups denied that either of the
defendants were involved in the holdup or shoot-
ings. The prosecutor then showed her a statement
she purportedly made on a previous occasion. She
admitted signing the statement, but denied that it
accurately represented what she had said.

At this juncture, Sergeant Charles McEwen of
the Detroit Police Department Homicide Unit
stated that on April 14, 1977, he took the taped
statement from Charlene Billups. He further
stated that, after hearing the tape, Ms. Billups had
admitted its accuracy. The taped statement was
then played before the jury. The trial court then
instructed that the recording could be used for
impeachment purposes only.

Charlene Billups was then recalled to the stand.
She stated that she murdered nobody and that her
plea was in exchange for a promise from the
prosecutor to write the parole board indicating she
should be released in ten years. She further stated
that she pled guilty because her lawyer told her
she would not prevail if she went to trial. Ms.
Billups then stated that neither defendant Billups
nor Barnes participated in the shootings and
holdup. The prosecutor then attempted to refresh
the witness's recollection or impeach her with the

statement she had given upon her arrest. Again, the trial court instructed that the prior statement went to credibility only.

Police testimony concerning various aspects of the investigation followed. Only the highlights will be touched upon. Mark Porter, a police officer employed by Wayne State University, testified that he arrested the driver of an orange Chevrolet because he saw a gun barrel protruding from a garbage bag inside the car. The man he arrested was Hershel Stewart, Barnes' brother. Sergeant Joseph Bemke testified that Ms. Billups gave a statement admitting her complicity with defendants Billups and Barnes in the incident after having been advised of her constitutional rights.

Defendant Barnes took the stand in his own behalf. On January 30, 1977, at about 5 p.m., he was at home with his mother, sister, and possibly his brother. Between 6 p.m. and 6:30 p.m., he received a call from his cousin, Tony Patterson. After this, he went next door to the home of his woman friend, Brenda Maxwell. Twenty to twenty-five minutes later, he returned home. At this time, his mother, sister, brother, and a friend of his sister were there. About 7:45 p.m., he left his mother's house. He then left to go to the house of a Barbara Collins in a 1973 gold Buick LeSabre. He arrived at Ms. Collins home about 8 p.m. Between 9:30 p.m. and 10 p.m., he left Ms. Collins' house with her and another friend named Debra Hicks. The trio went to Ms. Hicks' house and moved furniture for about two hours. They then returned to Ms. Collins' home, and Barnes called his house and talked to his mother and sister. The witness then learned the police were looking for him, and he decided to go to the police station at 1300 Beaubien to talk to a Sergeant Davis. He

went home, picked up his mother and brother, and was arrested on his way to the police department. Barnes concluded by saying he had never been to 2912 Belvidere.

Joyce Vaughn stated that Robert Barnes was her son. On January 30, 1977, she went out on a date about 5:30 p.m. At this time, Barnes was at the house. She returned about 7, and defendant Barnes was still at home. Around 8 p.m., Barnes left the house. Somewhere between 11:30 p.m. and midnight, Barnes returned home. Mrs. Vaughn, Alvin Vaughn, and Barnes then went to the police station, but were stopped by the police before they got there.

Brenda Kennedy testified that on January 30, 1977, she saw Barnes at her house sometime between 5:30 p.m. and 6 p.m.

Donna Vaughn, Barnes' sister, stated that on the day in question, her brother left to visit Ms. Kennedy for 15 to 20 minutes. He then came back home and was there when she left about 7:30 p.m.

Alvin Vaughn stated that Barnes was his brother. About 5 p.m., Barnes visited Ms. Kennedy next door for 15 or 20 minutes. Barnes left the house again a little before 8 p.m.

Barbara Collins testified that on January 30, 1977, between 7 p.m. and 7:30 p.m., Barnes came to her house. They left about 9 p.m. to go over to Debra Hicks' home. Ms. Hicks was also with them. After helping Ms. Hicks move, they returned to Ms. Collins' house about 11:30 p.m.

Debra Hicks stated that she met Barnes on January 30, 1977, at Barbara Collins' home. She asked him to help move some furniture out of her house to Ms. Collins' home. Barnes agreed to help.

*People v Till,* 80 Mich App 16; 263 NW2d 586 (1977), holds that the element of malice required

for conviction of felony-murder may be directly imputed as a matter of law from the underlying felony. See also, *People v Wilder,* 82 Mich App 358; 266 NW2d 847 (1978), *lv gtd* 403 Mich 816 (1978), *People v Butts,* 85 Mich App 435; 271 NW2d 265 (1978), *People v Lovett,* 85 Mich App 534; 272 NW2d 126 (1978). Some jurists and commentators contend that the addition of larceny and extortion to the list of enumerated felonies erodes the rationale of the felony-murder doctrine, *viz.,* that one intending to commit any of the felonies listed in the first-degree murder statute possesses a life endangering state of mind, since larceny and extortion do not usually involve behavior inherently dangerous to human life. If the addition of larceny and extortion to the list of enumerated felonies is wrong, such an issue can be submitted for judicial review when an applicable fact situation is presented. Situations have been present in the past and will exist in the future where judicial wisdom may be called upon to make an exception to the rule of *People v Till* and its progeny.

To follow *People v Wilson,* 84 Mich App 636; 270 NW2d 473 (1978), by remanding this case for entry of a judgment of conviction of manslaughter, or to give the prosecutor the option of retrying the defendants on the first-degree murder charge under the facts in this case is to glorify form over overwhelming substance. We decline to do so.

The next of the numerous errors alleged by the defendants was the prosecution's failure to produce Carrie Gilliam, a res gestae witness. This allegation is groundless since Ms. Gilliam testified at trial.

Five of the remaining issues concern instructions to the jury, none of which was properly

preserved for appeal. The instructions on aiding and abetting included all three of the required elements and, thus, were sufficient. *People v Burgess,* 67 Mich App 214, 220; 240 NW2d 485 (1976), *lv den* 397 Mich 830 (1976). The trial court did instruct upon the required element of intent in the offense of armed robbery. That instruction was more explicit in this regard than the one approved in *People v Metcalf,* 65 Mich App 37, 51; 236 NW2d 573 (1975). The jury instruction defining circumstantial evidence, while not particularly precise, is not grounds for reversal because defendants' convictions stemmed from eyewitness testimony, rather than circumstantial evidence. *People v Chandler,* 75 Mich App 585, 591; 255 NW2d 694 (1977). There was no need for the trial court, *sua sponte,* to give a special instruction concerning identification of the defendants in light of several unwavering eyewitnesses' identifications plus adequate jury instructions concerning reasonable doubt. *People v Roberson,* 90 Mich App 196, 203; 282 NW2d 280 (1979), *lv den* 407 Mich 908 (1979). Nor was there the necessity to caution the jury, *sua sponte,* concerning their consideration of accomplice testimony where the accomplice in this case offered no testimony that was prejudicial to defendants. Charlene Billups testified at trial that neither of the defendants participated in the shootings and holdups. Moreover, separate testimony inculpated defendants. *Cf. People v McCoy,* 392 Mich 231, 236-240; 220 NW2d 456 (1974).

The trial court committed no error in allowing the preliminary examination testimony of a witness to be read at trial since all counsel stipulated that the witness was hospitalized at the time of trial and was not physically able to speak. No objection was made when such testimony was

admitted, the witness was subjected to cross-examination at the preliminary examination, and the testimony was not crucial inasmuch as other witnesses' testimony was equally damaging to defendants' cases. *People v Castaneda,* 81 Mich App 453, 458-459; 265 NW2d 367 (1978).

We also find that it was not error to allow impeachment of Charlene Billups, an endorsed prosecution witness, when she failed to implicate defendants in the crime as anticipated. Even though the Michigan Rules of Evidence were not in effect at the time of the trial, the requirements of MRE 607(2)(C) were fulfilled, and that rule would apply to a retrial of the defendants. Moreover, previously applicable case law supports the ruling of the trial court in this particular. *People v Alphus Harris,* 56 Mich App. 517, 524-526; 224 NW2d 680 (1974).

Defendant Billups presents additional arguments in a supplemental brief that address the performance of his counsel at trial. These arguments center largely on the fact that he did not testify at trial. Had he testified, however, it was possible that two armed robbery convictions obtained approximately one month prior to the trial in this case would have been admitted as similar acts. But, more importantly, no less than five witnesses identified one or both of the defendants as the perpetrators of the crimes charged. In light of these circumstances, and without substantiation of other alleged examples of trial counsel's ineffective assistance, we conclude that defendant Billups was furnished a fair trial with able representation.

The last argument we address is the propriety of the denial of defendants' motions for separate trials. This determination is given to the discretion of the trial court. MCL 768.5; MSA 28.1028. Such

determination will not be overturned absent an affirmative showing that a joint trial prejudiced the substantial rights of the accused. *People v Schram,* 378 Mich 145, 156; 142 NW2d 662 (1966). Prior to the trial, both defendants filed affidavits which stated that they were entitled to separate trials since defendant Billups had already asserted, in a statement to the police, that he had acted in self-defense, while defendant Barnes had filed notice of an alibi defense. Thus, they urged, due to their inconsistent defenses, they would be denied a fair trial. We agree with the defendants that their proffered defenses were inconsistent; at the same time, the record clearly demonstrates that neither defendant incriminated the other. While defendant Billups professed initially that he had acted in self-defense, at trial he offered no defense, declining to testify. Defendant Barnes presented a vigorous alibi defense which employed several witnesses, but his counsel, in closing, carefully admonished the jury to keep defendants' respective cases separate. Besides this reference, Billups never figured in Barnes' defense. Under these circumstances, and especially in light of the overwhelming evidence produced against defendants, we find no abuse of discretion in the ruling that denied severance. *People v Carroll,* 49 Mich App 44, 49-50; 211 NW2d 233 (1973), *aff'd* 396 Mich 408, 414; 240 NW2d 722 (1976).

We find no error necessitating reversal and, therefore, affirm.

Affirmed.

V. J. BRENNAN, J., concurred.

M. F. CAVANAGH, J. *(dissenting)*. My brothers' lengthy recitation of the facts and testimony adduced at trial is persuasive argument for the

proposition that the jury could easily have found the requisite malice. While I agree with this proposition, it misses the mark. The error here lies in the fact that the challenged instruction removed from the jury the necessity to find malice at all. In effect, while they could have found malice, they were told they did not have to. This was error under *People v Fountain,* 71 Mich App 491; 248 NW2d 589 (1976). Accordingly, I would remand for entry of manslaughter verdicts and resentencing, unless the prosecution elects to retry defendants for first-degree murder. *People v Wilson,* 84 Mich App 636; 270 NW2d 473 (1978).